IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| STEAK IN A SACK, INC., | * | |
| Plaintiff, | * | |
| v. | | Case No.: GJH-17-1369 |
| | * | |
| COVINGTON SPECIALTY INSURANCE COMPANY, | * | |
| Defendant. | * | |

## MEMORANDUM OPINION

Plaintiff Steak in a Sack, Inc., a Maryland restaurant, has sued its former insurer, Defendant Covington Specialty Insurance Company, for Breach of Contract and Lack of Good Faith. ECF No. 2. This case was removed from the Circuit Court for Prince George's County pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332, as Plaintiff is a Maryland resident, Defendant is a New Hampshire corporation and the amount in controversy is more than $75,000.00. The parties have filed cross-Motions for Summary Judgment. ECF Nos. 30, 31, 34.[1] No hearing is necessary. See Loc. R. 105.6 (D. Md. 2016). For the following reasons, both motions for summary judgment are denied.

## I. BACKGROUND[2]

Defendant Covington Specialty Insurance Company ("Covington")[3] is a New Hampshire corporation and operates as a Surplus Lines Insurance[4] Carrier in Maryland. ECF No. 2 at 2;

---

[1] Also pending is Plaintiff's Motion to Strike one of Defendant's exhibits to its Motion for Summary Judgment. ECF No. 35.
[2] The facts relied on herein are either undisputed or viewed in the light most favorable to the non-moving party.
[3] Covington does business also as "RSUI Indemnity Company" and "Landmark American Insurance Company." ECF No. 2.

1

ECF No. 11 at 1. Tapco Underwriters, Inc. ("Tapco") was the managing general agent for Covington. ECF No. 31-3 at 3.[5] Plaintiff Steak in a Sack, Inc. is the entity that runs a restaurant by the same name located in Temple Hills, Maryland. ECF No. 2 ¶ 4. Covington was Plaintiff's insurance provider and on June 19, 2015, Plaintiff applied for a renewal of its insurance contract with Covington, using a form provided by Tapco. ECF No. 31-2 ¶ 4. An Insurance Policy was subsequently entered into for the period of June 19, 2015 to June 19, 2016 (the "Policy"). ECF No. 2-1 at 5. On July 21, 2015, at Tapco's request, York Risk Control ("York") performed an inspection of Plaintiff's restaurant. *Id.* ¶ 5. York noted that Plaintiff did not have a "K-class fire extinguisher located within 30 feet of the kitchen," and recommended that such an extinguisher be "mounted in a readily accessible area of the kitchen by a licensed fire protection contractor." *Id.* ¶ 6. On August 3, 2015, Tapco sent a letter to Plaintiff's insurance broker, Walterry, Inc., and requested that York's recommendations be implemented. *Id.* ¶ 7. Tapco further explained that "[i]f no response is received within 20 days, the carrier will require us to issue an additional premium endorsement and/or a notice of cancellation." *Id.* On September 2, 2015, having received no response, Tapco issued a Notice of Cancellation to the Plaintiff, reflecting that the Insurance Contract would be cancelled on October 18, 2015. *Id.* ¶ 8. On October 16, 2015, Ashleigh Kalid, one of Plaintiff's employees, called Stacey Shanklin, a Policy Issuance Supervisor for Tapco, to inform Tapco that Kalid had implemented the recommendations; Shanklin sought additional documentation. *Id.* ¶ 9. At approximately 1:28 pm, Kalid subsequently emailed Shanklin a photograph of a fire extinguisher sitting on a counter and three photographs of documents. ECF No. 31-2 at 6–10.

---

[4] "'Surplus line' insurance means the full amount or policy of insurance required to protect the interest of the insured which cannot be obtained ... from insurers authorized to do business in this State." *Smith v. Underwriters at Lloyd's of London*, 326 Md. 600, 601 (1992).
[5] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

At this point, the parties' versions of events diverge. According to Tapco and Shanklin, these photographs were insufficient proof that Kalid had implemented the recommendations, as it was "not evident from the photograph . . . that the fire extinguisher was a K-rated wet chemical type fire extinguisher or that it had been mounted in a readily accessible area of the kitchen . . ." *Id.* ¶ 11 (internal quotations omitted). Shanklin claims that at 1:59 pm, a half hour after receiving the email from Kalid, Shanklin responded and asked for further information regarding the fire extinguisher. *Id.* ¶ 12. At 4:36 pm, two and a half hours later, she sent a follow-up email requesting "a photo of the extinguisher, once it's installed" as well as "a photo of the label or 'bill of sale' indicating that this is a 'K' Type fire extinguisher." *Id.* ¶ 13.[6] In order to give Steak in a Sack an opportunity to provide the requested information, Shanklin explains that the Insurance Contract was reinstated on October 20, 2015, "to provide Plaintiff with additional time to provide the documentation requested . . . ." *Id.* ¶ 14. On November 6, 2015, having not received the requested information, Shanklin emailed Kalid and stated that "I don't show that we've [received] the required information. I'll have to request cancellation . . . ." *Id.* ¶ 15. That same day, Shanklin ordered the cancellation of Plaintiff's insurance coverage. *Id.* ¶ 16.

Plaintiff disputes this recitation of events. In her Affirmation, ECF No. 34-9, Ashleigh Kalid explains that the fire extinguisher they purchased was in fact a "K" rated wet chemical type fire extinguisher, but that it was not possible to mount the extinguisher in the kitchen "given the location of the stoves, hood and stainless steel backing." *Id.* ¶ 12. Kalid alleges that she called Shanklin and explained the difficulty in mounting the extinguisher, and that Shanklin told her that the extinguisher could be placed on a shelf in a readily accessible area of the kitchen. *Id.* ¶ 13. Furthermore, Kalid alleges that after she sent the photographs of the extinguisher to Shanklin, she spoke with Shanklin who told her that "the recommendations had been met and

---

[6] Copies of these emails were attached to Shanklin's Unsworn Declaration. *See* ECF No. 31-2 at 6, 11.

that nothing further was needed." *Id.* ¶ 14. Kalid further alleges that she was told that the Insurance Policy "was reinstated due to the Plaintiff's compliance with the inspection recommendations." *Id.* ¶ 18. Regarding the emails that Shanklin claimed to have sent on October 16, 2015 at 1:59 pm and 4:36 pm, and on November 6, 2015, Kalid alleges that she never received those emails. *Id.* ¶ 20. Kalid further alleges that neither she nor Steak in a Sack ever received a subsequent cancellation notice, and that they continued to check their online account until February 2016, and "was informed that the account was 'Active' and that all premiums had been 'PAID OFF.'" *Id.* ¶ 24.

On February 19, 2016, a fire occurred at Plaintiff's restaurant, resulting in property damage. *Id.* ¶ 27. Defendant refused to pay for the loss, and Plaintiff filed suit in the Circuit Court for Prince George's County, Maryland on March 22, 2017. ECF No. 2. In its Complaint, Plaintiff alleges one count of Breach of Contract (Count I) and one count of Lack of Good Faith (Count II). *Id.* On May 18, 2017, Defendant removed the case to this Court, ECF No. 1, pursuant to the Court's diversity jurisdiction, ECF No. 11. Defendant filed an Answer to the Complaint on May 22, 2017. ECF No. 9. On January 29, 2018, Plaintiff filed a Partial Motion for Summary Judgment, ECF No. 30, and Defendant filed a Motion for Summary Judgment, ECF No. 31. Plaintiff subsequently filed a Motion for Summary Judgment, ECF No. 34, and moved to strike an exhibit from Defendant's Motion for Summary Judgment, ECF No. 35. All motions have been fully briefed.

## II. STANDARD OF REVIEW

A party may move for summary judgment under Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial

4

responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings . . . together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 466 U.S. 317, 323 (1986) (internal citation omitted). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). To withstand a motion for summary judgment, the nonmoving party must do more than present a mere scintilla of evidence. *Phillips v. CSX Transport, Inc.*, 190 F.3d 285, 287 (4th Cir. 1999). Rather, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. No genuine issue of material fact exists if the non-moving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *See Celotex*, 477 U.S. at 322–23. Although the Court should draw all justifiable inferences in the nonmoving party's favor, the nonmoving party cannot create a genuine issue of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "The Court must deny both motions if it finds there is a genuine issue of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Wallace v. Poulos*, No. DKC 2008-0251, 2009 WL 3216622, at *4 (D. Md. Sept. 29, 2009) (internal citation omitted).

## III. DISCUSSION

In its Motions for Summary Judgment, Plaintiff alleges that there is no dispute that Defendant did not comply with certain notice provisions of the Maryland Insurance Code, and that the cancellation notice was sent from and to the wrong parties pursuant to the Policy. ECF No. 30-1; ECF No. 34. In its Motion for Summary Judgment, Covington alleges that the notice provisions of the Maryland Insurance Code do not apply to it, and that it cancelled the Policy prior to the fire in good faith. ECF No. 31-1. The Court first examines whether the notice provisions of the Maryland Insurance Code cited by Plaintiff apply to Defendant, before examining whether Defendant complied with the terms of the Policy when it cancelled Plaintiff's coverage.

### A. Application of Maryland Insurance Code

The Court first considers whether certain provisions of the Maryland Insurance Code apply to Defendant's cancellation of Plaintiff's insurance policy. Md. Code, Ins. § 27-603 provides that for cancellation of a "commercial insurance"[7] policy, "at least 45 days before the date of the proposed cancellation or expiration of the policy, the insurer shall send to the insured, by a first-class mail tracking method or by commercial mail delivery service, written notice of intention to cancel for a reason other than nonpayment of premium or notice of intention not to renew a policy issued in the State."

Based on the evidence before the Court, it appears that Defendant did not comply with the provisions of § 27-603, as it mailed notice to Plaintiff without a tracking method or by commercial mail delivery service. However, Maryland courts have made clear that not all provisions of the Maryland Insurance Code apply to surplus lines insurers. In *Smith v.*

---

[7] "'Commercial insurance' means property insurance or casualty insurance issued to an individual, a sole proprietor, partnership, corporation, limited liability company, or similar entity and intended to insure against loss arising from the business pursuits of the insured entity." MD Code § 27-601(b)(1).

6

*Underwriters at Lloyd's of London*, the Court of Appeals of Maryland considered whether a notice requirement in the Maryland Code applied to surplus lines insurers. 326 Md. 600, 601 (1992). While regulations regarding surplus lines insurers were contained in a separate section, the Court of Appeals reasoned that "that indication does not necessarily exclude regulation affecting surplus lines elsewhere in the Insurance Code." *Id.* at 609–10. On the other hand, however, the Court of Appeals reasoned that "the absence of any express exclusion of surplus lines carriers from [the notice requirement] . . . does not compel the result that surplus lines carriers are thereby included." *Id.* at 610–611. Ultimately, in finding that surplus lines carriers were not covered by the provision of the Insurance Code in question, the Court of Appeals looked to the "history of the development of the notice requirement," a comparison with other provisions "dealing with the class of insurers contemplated by that section," and the "legislative policy toward substandard property insurance risks." *Id.* at 611. Of particular importance, the court looked to the provision's requirement that insurers cancelling a policy advise the insured of the "Maryland FAIR Plan," a program to "make essential property insurance and certain homeowner's insurance available from the [Joint Insurance Association (JIA)] to all qualified applicants . . . and [t]o utilize fully the voluntary insurance market as a source of essential property and homeowner's insurance." *Id.* at 613. The court reasoned that the section "addresses the problem of the property owner whose premises may no longer be insurable in the voluntary market and who may have to seek coverage from the JIA." *Id.* at 614. The court concluded that the notice requirement indicated that "insurer" did not include surplus lines carriers "whose Maryland insureds already owned risks treated by the industry as substandard, or unusual" and who could not take advantage of the "voluntary insurance market." *Id.*

While the specific notice requirement at issue here was enacted following the Court of Appeals' decision in *Smith*, the Court concludes that its use of the term "insurer" similarly does not include surplus lines carriers. Similarly to the provision at issue in *Smith*, § 27-603(b)(1) requires the "insurer" to "notify the insured of the possible right to replace the insurance under the Maryland Property Insurance Availability Act, through the Maryland Automobile Insurance Fund, or through another plan for which the insured may be eligible." As in *Smith*, it would not make sense for this to apply to surplus lines carriers, as their customers "already owned risks treated by the industry as substandard, or unusual" and would likely not be eligible for the alternatives listed in § 27-603(b)(1). Furthermore, § 27-603(b)(1) was enacted following the Maryland Court of Appeals's decision in *Smith*, yet the General Assembly chose not to include a definition for "insurer" that could have included surplus lines carriers.

Although no Maryland court has opined on this specific issue, the Maryland Insurance Administration ("MIA"), the agency charged with administering the Insurance Code, has taken the position that "§§ 27-603, 27-604, and 27-605 of the Insurance Article of the Annotated Code of Maryland do not apply to a surplus lines carrier." ECF No. 31-10 at 3.[8] While such a determination is not binding on the Court, in Maryland, "the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference . . . ." *Brethren Mutual Insurance Co. v. Buckley*, 437 Md. 332, 348 (2014) (concluding that the court's interpretation was "aligned with the one used by the MIA in related proceedings"). *See also*

---

[8] Following Defendant's submission of an MIA opinion as an exhibit to its Motion, ECF No. 31-10, Plaintiff filed a Motion to Strike the MIA opinion, ECF No. 35. Plaintiff argues that MIA decisions are "legal nullit[ies]," and have no collateral effect and should not be considered by the Court. ECF No. 35-1 at 2 (quoting *Thompson v. State Farm Mutual Auto. Ins. Co.*, 196 Md. App. 235 (2010)). *Thompson*, cited by Plaintiff, is not persuasive. There, the Court of Special Appeals of Maryland was not confronted with an MIA opinion, but refused to give weight to a venue choice that was impacted by the "convenience of MIA." *Id.* at 251. In fact, the court specifically left open the question of whether "a MIA or an ALJ decision, or the record in such proceedings, would be admissible in court." *Id.* at 251 n.23. Subsequent Maryland cases have afforded interpretations of agencies like MIA "great deference." *Brethren Mutual Insurance Co. v. Buckley*, 437 Md. 332, 348 (2014). Plaintiff's Motion to Strike is therefore denied.

*Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321 (D. Md. 2012) (reasoning that "[u]nder Maryland law, an agency's interpretation and application of the statute which [it] administers should ordinarily be given considerable weight by reviewing courts" (internal quotation omitted)).

Thus, the requirements of § 27-603 did not apply to Defendant as a surplus lines carrier and, in cancelling the Policy, Defendant need only have complied with the stated terms of the Policy.

**B. Compliance with Insurance Policy Terms**

Having determined that the notice requirements of § 27-603 did not apply to Defendant, the Court must determine whether, based on the evidence before it, either party is entitled to summary judgment on the question of whether Defendant complied with the terms of the insurance policy. The issues raised by the parties are whether, under the terms of the contract: (1) Defendant was permitted to terminate the contract for Plaintiff's alleged failure to incorporate inspection recommendations; and (2) whether Defendant complied with the policy's notice requirements.

First, the parties dispute whether Defendant was permitted to terminate the Policy. "Courts in Maryland follow the law of objective interpretation of contracts, giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean." *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 79 (2006) (internal quotation omitted). The Policy provides that the Defendant "may cancel this policy by mailing or delivering" to Plaintiff "written notice of cancellation at least: a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or b. 30 days before the effective date of cancellation if we cancel for any other reason." ECF No. 2-1 at 17. The Policy does not

restrict what "any other reason" may entail, but provides that Defendant must mail the notice to Plaintiff's "last mailing address" and that "proof of mailing will be sufficient proof of notice." *Id.* The Policy also provides that Defendant has the right to "[m]ake inspections and surveys at any time," "[g]ive [Plaintiff] reports on the conditions [Defendant] find" and "[r]ecommend changes." *Id.* Thus, based on the terms of the Policy, Defendant could terminate the Policy so long as it gave the contractual notice to Plaintiff and acted in good faith.

Second, the parties dispute whether Defendant properly gave Plaintiff notice that it was terminating the policy. Plaintiff argues that the notice was sent neither from nor to the proper party, as it was sent from Tapco to Walterry (rather than from Defendant to Plaintiff as required by the Policy), and that it was not properly sent. ECF No. 34 at 34–36. In response, Defendant argues that Tapco "as agent for [Covington], had authority to act on Defendant's behalf . . . ." ECF No. 40 at 14.

"In an agency relationship, one person, the principal, can be legally bound by actions taken by another person, the agent." *Dickerson v. Longoria*, 414 Md. 419, 441–42, 995 A.2d 721, 735 (2010). An agency relationship is created when the principal confers actual or apparent authority on the agent. *Id.* "Actual 'authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.' " *Citizens v. Maryland Indus.,* 338 Md. 448, 459 (1995) (quoting Restatement (Second) of Agency § 26 (1958)). Actual authority "may be inferred from conduct, including acquiescence." *Anderson v. General Casualty,* 402 Md. 236, 247 (2007). In the absence of actual authority, a principal can be bound by the acts of a purported agent when that person has apparent authority to act on behalf of the principal. "Apparent authority results from certain acts or manifestations by the alleged principal

10

to a third party leading the third party to believe that an agent had authority to act." *Klein v. Weiss,* 284 Md. 36, 61 (1978). "It is nearly axiomatic that one dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers." *P. Flanigan & Sons v. Childs,* 251 Md. 646, 654 (1968).

Plaintiff seeks judgment in its favor that Defendant did not comply with the terms of the Policy because the communication of termination was between Tapco and Walterry, which Plaintiff argues violated the contractual provision requiring the Defendant to notify Plaintiff directly. However, the Policy itself lists Tapco as the agent for Covington, and is signed by Tapco as "Authorized Representative." *See* ECF No. 40 at 15; ECF No. 2-1 at 5. In their Complaint, Plaintiff alleges that "[a]t all times herein, TAPCO has been the agent of Covington." ECF No. 2 ¶ 7. Similarly, the Policy identifies Walterry as Steak in a Sack's "Retail Agen[t]." ECF No. 2-1 at 5. Thus, summary judgment in Plaintiff's favor is not warranted on this issue.

### C. Estoppel/Waiver

Finally, Plaintiff argues that the Defendant is estopped from cancelling the policy based on the Plaintiff's failure to comply with the inspection recommendations, as Defendant "waived the right to cancel the policy" when it told Plaintiff "that the steps taken with regard to the fire extinguisher and the revenue data was sufficient, and the insured relied on the same and paid premiums and did not take steps to further comply . . . ." ECF No. 34 at 37.

Maryland courts recognize that "the right of an insurer to forfeit or avoid the policy may be lost by the doctrine of waiver or estoppel." *Rubinstein v. Jefferson Nat. Life Ins. Co.*, 268 Md. 388, 392 (1973). "[W]here an insurance company adopts a course of conduct which induces an honest belief, reasonably founded in the mind of the insured, that strict compliance with policy provisions will not be required . . . and the insured is misled, the company will be deemed to

have waived the right to claim an automatic forfeiture and will be estopped to elect to discontinue the insurance." *Allstate Ins. Co. v. Reliance Ins. Co.*, 141 Md. App. 506, 514–15 (2001). "Waiver" is defined as:

> the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances. . . . And acts relied upon as constituting a waiver of the provisions of a contract must be inconsistent with an intention to insist upon enforcing such provisions.

*Rubinstein*, 268 Md. at 392–93.

Here, the parties dispute what Defendant told Plaintiff regarding the sufficiency of the fire extinguisher. On the one hand, Kalid alleges that after she sent the photographs of the extinguisher to Shanklin, she spoke with Shanklin who told her that "the recommendations had been met and that nothing further was needed." ECF No. 34-9 ¶ 14. Kalid further alleges that she was told that the Insurance Policy "was reinstated due to the Plaintiff's compliance with the inspection recommendations." *Id.* ¶ 18. On the other hand, Shanklin alleges that she requested via email additional information from Plaintiff regarding the fire extinguisher and revenue amounts, and reinstated the Policy only to give Plaintiff additional time to comply with the recommendations.[9] ECF No. 31-2 at 6 ("We can possibly give you an extension on this [mounting requirement] but it needs to be compliant."), 11 ("I have requested reinstatement, but – we will have to re-cancel if the above items are not rcvd within 15 days."), 16 ("Following up

---

[9] Plaintiff disputes the veracity of these emails, and claims that Kalid never received them. *E.g.* ECF No. 41 at 2. Defendant submitted a CD to the Court which purportedly contained the original electronic copies of these emails. ECF No. 40 at 8 n.10. Defendant explains that "[t]he metadata may be viewed by looking at the 'Properties' for each email, which establishes that the emails were sent on the date and times referenced in Defendant's [Statement of Material Facts]." *Id.* In response, Plaintiff points out irregularities regarding certain dates on the emails, and continues to maintain that the emails were never received. ECF No. 41 at 4. Defendant did not submit any sort of expert declaration regarding the authenticity of the metadata of these emails. The Court is not a factual expert on email metadata, was not able to view the metadata as the documents were incompatible with the Court's computer system, and the Court cannot confirm the veracity of the emails. Thus, the Court concludes that there is a genuine dispute regarding whether the emails were sent.

on the below e-mail. I don't show that we've rcvd the required information. I'll have to request cancellation . . . .").

If Defendant indeed informed Plaintiff that "the recommendations had been met and that nothing further was needed" and Plaintiff chose not to do anything further in reliance on this comment, then Defendant was likely estopped from cancelling the Policy for Plaintiff's failure to comply with the recommendations, and such cancellation would have been in bad faith. If, however, Defendant sent Plaintiff the purported emails and made clear that they were still waiting for compliance and that any extended reinstatement was temporary and contingent on compliance with the recommendations, then Defendant was well within their rights when they cancelled the Policy. Thus, there is a genuine dispute of material fact, and the Court will deny the cross-motions for summary judgment on this issue.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Partial Motion for Summary Judgment, ECF No. 30, Defendant's Motion for Summary Judgment, ECF No. 31, Plaintiff's Cross Motion for Summary Judgment, ECF No. 34, and Plaintiff's Motion to Strike, ECF No. 35, are all denied. A separate Order shall issue.

Date: <u>September 28, 2018</u>      <u>      /s/                              </u>
                                     GEORGE J. HAZEL
                                     United States District Judge

13